UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

FLORENCE HERVEY,                                    Civil No. 04-4537 (PJS/RLE)

                Plaintiff,


v.                                                  MEMORANDUM OPINION AND ORDER
                                                    GRANTING DEFENDANTS' MOTION
                                                    FOR SUMMARY JUDGMENT

COUNTY OF KOOCHICHING, SHERIFF
DUANE NELSON, individually and in his
official capacity, and UNDERSHERIFF
JOHN MASTIN, individually and in his
official capacity,

                Defendants.

---

      Celeste Culberth, CULBERTH & LIENEMANN, LLP, 1050 Piper Jaffray Plaza, 444
Cedar Street, Saint Paul, MN 55101, for plaintiff.

      Ann Goering, RATWIK, ROSZAK & MALONEY, PA, 730 Second Avenue South, Suite
300, Minneapolis, MN 55402, for defendants.


      Florence Hervey was hired as a deputy jail dispatcher by the Koochiching County

Sheriff's Department in 1976.  She served an uneventful 25 years in that position.  In 2001, she

was promoted to the newly created position of "jail administrator."  Initially, Hervey reported

directly to Sheriff Duane Nelson, the head of the Department.  The undersheriff at that time —

Robert Byman — was the second-ranking employee of the Department.  But, by all accounts,

Byman was a hands-off administrator, and he did not object to Hervey exercising almost

complete authority over the jail and reporting directly to Nelson.

      Hervey worked with Nelson and Byman for two years without incident.  Byman then

announced his retirement and, in 2003, Nelson appointed John Mastin to replace him.  Mastin

was, by all accounts, a hands-on administrator — the opposite of Byman.  Mastin wanted all of

the Department's employees (including Hervey) to report through him to the sheriff.  Nelson

agreed and directed Hervey to report to Mastin.

This decision touched off a feud between Hervey on the one hand and Nelson and Mastin

on the other — a feud that is now well into its fourth year.  Hervey was incensed that she was

asked to report to Mastin, whom she considered to be her peer, not her superior.  Beginning

almost from the moment that Nelson's decision was announced, Hervey has found many ways

(direct and indirect, passive-aggressive and aggressive-aggressive) to let Nelson and Mastin

know of her unhappiness — actions that Nelson and Mastin regard as insubordinate and as

sometimes contrary to Departmental policies.  Nelson and Mastin have grown increasingly

exasperated with Hervey, and they have expressed their exasperation in many ways, from raising

their voices to suspending Hervey without pay — actions that Hervey regards as discriminatory

or retaliatory.  Each allegedly wrongful act of Nelson or Mastin has, in turn, spurred Hervey on

to further allegedly wrongful acts of her own, and each allegedly wrongful act of Hervey has

spurred Nelson and Mastin on to further allegedly wrongful acts of their own.  And on and on

the feud has gone.

The feud has also given rise to this lawsuit.  Hervey has sued Nelson, Mastin, and

Koochiching County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq.

("Title VII") for sex discrimination, for creating a hostile work environment, and for retaliation.[1]

---

[1]Hervey has brought identical claims under the Minnesota Human Rights Act
("MHRA"), Minn. Stat. § 363A.08.  Claims under the MHRA are analyzed under the same
standards as claims under Title VII.  *See Conquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th
Cir. 2001) (applying federal analysis to MHRA sex discrimination claims); *Scott v. County of
Ramsey*, 180 F.3d 913, 917 (8th Cir. 1999) (applying federal analysis to retaliation claims under

Hervey also alleges that Koochiching County is liable for violations of the Minnesota Government Data Practices Act ("MGDPA") allegedly committed by Mastin.  The defendants have moved for summary judgment.

## I.  BACKGROUND

Koochiching County did not have a jail administrator until 2001.  Before then, the sheriff and undersheriff ran the jail — scheduling corrections officers' shifts, transporting prisoners, ordering supplies, and making sure that the jail complied with all legal standards.  Nelson Dep. 9-11.  After Nelson was elected sheriff in 1999,[2] he quickly determined that he could not tackle all of his other duties while running the jail.  He asked the Koochiching County Board to add the position of jail administrator to his staff.  Nelson Dep. 9, 14-16.  The Board eventually agreed. Culberth Decl. Ex. 30.

Hervey and four others applied for the new position.  Hervey Dep. 11-12.  The candidates were interviewed by a subcommittee of the Koochiching County Board.  Hervey Dep. 11-12. The subcommittee recommended Hervey, and Nelson accepted the recommendation.  Nelson Dep. 71-73; Jaksa Dep. 122.  Hervey assumed her new responsibilities on February 12, 2001. Hervey Dep. 15.

Hervey did well.  She kept the E/911 corrections officers on schedule, wrote new policies for the jail, updated the sheriff's office manual, and brought the jail into compliance with all state and local standards.  Hervey Dep. 16-20; Carlson Dep. 44.  By 2003, Sheriff Nelson was

---

MHRA).  For that reason, this opinion will refer only to the federal claims.

[2]Nelson retired on December 31, 2005.  For the purposes of this opinion, though, he will sometimes be referred to as though he were still serving as sheriff.

calling Hervey a "godsend," Congrave Dep. 54, and a state inspector wrote in a report that "Hervey is one of the most organized and efficient jail administrators that I have had an opportunity to deal with," Culberth Aff. Ex. 21 at 39 (Koochiching County Facility Inspection Report).

Hervey enjoyed a great deal of autonomy.  Nelson Dep. 74.  Nelson and Byman (the undersheriff) took a hands-off approach, giving Hervey the freedom to run the jail pretty much as she saw fit.  Nelson Dep. 77.  Hervey reported directly to Nelson and had little interaction with Byman.  Nelson Dep. 74-76; Byman Dep. 59-61.  Even during this period of calm before the storm, though, it was clear that Hervey cared deeply about where she ranked in the pecking order.  Her one major disagreement with Byman during this period was a dispute over who was "second in line" and responsible for overseeing the jail in the sheriff's absence.  Nelson Dep. 82, 88.

In the spring of 2003, Byman announced his retirement, and Nelson appointed Mastin to replace him.  Nelson Dep. 84.  Mastin was a very different person from his predecessor.  Most important for purposes of this litigation, Mastin was much more controlling than Byman — as "hands on" as Byman was "hands off."  Even before taking office on May 1, 2003, Mastin pressed Nelson to change reporting lines in the Sheriff's Department.  Nelson Dep. 87-88. Nelson agreed that all employees of the Department — including Hervey — would report through Mastin.  Nelson Dep. 89-90; Congrave Dep. 54.  This change and several others were announced at a staff meeting on April 3, 2003.  Culberth Decl. Ex. 57 at 4-5.

Hervey was not able to attend that meeting.  Hervey Dep. 42-43.  She did, however, receive a copy of the minutes of the meeting, as well as a copy of the revised reporting structure

for the Sheriff's Department that had been distributed at the meeting.  Culberth Decl. Ex. 57;

Hervey Dep. 42-43.  She was appalled to learn that she would now be reporting to Mastin.  She

considered herself a peer of the undersheriff — not his underling — and she felt that being

required to report to the undersheriff was a major and undeserved demotion.  Hervey Dep. 43-44.

On April 9, 2003, Hervey sent an e-mail to Nelson — an e-mail that could charitably be

called snippy — asking whether Nelson was aware that he, and not the undersheriff, was her

direct supervisor.  Culberth Decl. Ex. 89 at J.  Hervey referred Nelson to her job description and

to an organizational chart in a County manual, and Hervey told Nelson that he did not have the

authority to change her reporting line without the approval of the County Board.  *Id.*

On April 11, 2003, Nelson called a meeting with Hervey, the outgoing Byman, and the

incoming Mastin.  Culberth Decl. Ex. 58.  Hervey again said that she would not report to Mastin

and again asserted that Nelson could not change her reporting line.  Supp. Hervey Decl. Ex. B at

Bates Nos. H 1317-20.  Nelson disagreed, arguing that, as the duly elected sheriff of

Koochiching County, he had the authority to organize his own department.  Nelson Dep. 90.

Tempers rose, and eventually Nelson and Hervey were shouting.  Nelson Dep. 91.  Mastin and

Byman left the room.  After talking further, Nelson tried to calm Hervey by giving her a hug and

asking if Mastin would be a problem for her.  Nelson Dep. 91.

As noted, Nelson had hired Hervey and thought highly of Hervey, and the two had

worked together well for many years — dating to long before Nelson was elected sheriff.

Nelson Dep. 9; Congrave Dep. 54-55.  In all that time, they had never had a fight like the one

caused by Nelson's decision to ask Hervey to report to Mastin, Nelson Dep. 92, and by Hervey's

determination that "she would not go willingly," Pl.'s Resp. Mem. 51.  Even today Hervey

continues to dispute that the sheriff has the authority to determine the reporting lines in his own department. *See id.* at 16 n.6; Hervey Dep. 41.

The relationship between Hervey, Nelson, and Mastin continued to deteriorate over the ensuing months and years — a deterioration recorded in painstaking detail by Hervey, who is an inveterate e-mailer and note-taker. The record in this case contains thousands of pages of documents detailing incidents between Hervey and Nelson, Hervey and Mastin, Mastin and jail dispatchers, Hervey and jail dispatchers, Hervey and the support staff, and so on. Only a few of the most significant incidents will be recounted below, organized roughly by the legal claims to which they most closely relate.

### A. Sex Discrimination

"Exhibit A" in Hervey's litany of complaints has always been Nelson's decision in April 2003 to ask her to report to Mastin. Hervey regarded this as a "demotion," and she cites it as the first of many acts of sex discrimination that she has suffered. Pl.'s Resp. Mem. 16; Culberth Decl. Ex. 89 at K. It should be noted, though, that although Hervey complained early and often about her "demotion," it was not until February 2004 — almost a year later — that Hervey alleged that Nelson had demoted her because she was a woman. Culberth Decl. 89 (Respectful Workplace Complaint). This, of course, is the same Nelson who had hired Hervey two years earlier over male competitors, who had praised Hervey as a "godsend," who had let Hervey run the jail pretty much as she saw fit, and who, as will be described below, fought to save Hervey's job from elimination.

Mastin's appointment as undersheriff was announced in the spring of 2003. Nelson Dep. 84. The State of Minnesota was then struggling to bring a huge deficit under control, and

counties and cities were bearing the brunt of the budget cutting.  Koochiching County needed to

make drastic cuts to its budget, and it asked its department heads — such as Nelson — to

identify expenses that could be eliminated.  Mastin Dep. 293; Jaksa Dep. 172.  Nelson asked

Mastin to help him to find savings in the budget for the Sheriff's Department, including the

budget for the jail.  Mastin Dep. 293.  Mastin, in turn, asked Hervey to identify cuts that could be

made in the jail's budget.  Hervey Dep. 81.  Hervey refused to do so.  Instead, Hervey insisted

that she could not cut one dime out of her budget, Hervey Dep. 83 — a facially implausible

claim that may have been motivated more by hostility to Mastin than by economic reality.

Indeed, Hervey went even further.  Not only did she refuse to find savings in the jail's

budget, but she had earlier gone over Nelson's and Mastin's heads to the County Board and

asked that her budget be *increased* by adding two positions for corrections officers.  Hervey

Dep. 81-82.  She did not clear this letter in advance with either of her supervisors.  Needless to

say, Nelson and Mastin were not pleased with either Hervey's refusal to help reduce the jail's

budget or her going over their heads to ask the County Board for a budget increase.

The budget crisis also meant that many County employees had to assume additional

duties.  For example, Nelson and Mastin agreed to take the shifts of deputy sheriffs in order to

reduce the need to spend money on part-time deputies.  Mastin Dep. 132.  Nelson and Mastin

asked Hervey to take on additional duties as well — in particular, to work two hours every

morning (from 8:00 a.m. to 10:00 a.m.) as a corrections officer, the job that she held before

becoming jail administrator.  Mastin Dep. 128-29.  Hervey accepted the additional duties, but

she did so grudgingly.  She felt personally insulted by Mastin and believed that her authority as

jail administrator was being undermined by the part-time duties, Hervey Dep. 48-49, especially

given that Mastin told Hervey that she could not be the jail administrator during the two hours that she worked as a corrections officer, Nelson Dep. 163.  Hervey now asserts that, although many Koochiching County employees (male and female) were asked to work harder to meet the budget crisis, the request to her was motivated by the fact that she was a woman.

Ironically, one of the persons responsible for this alleged discrimination — Nelson — was at the same time fighting to save Hervey's job.  The County Board was under a great deal of pressure to find budget savings, and some members of the Board targeted Hervey's position.  The County had survived without a jail administrator until 2001, and some Board members felt that the County could survive without a jail administrator again.  Jaksa Dep. 172-73.  But Nelson successfully worked to save Hervey's job.  Jaksa Dep. 173.

The budget crisis affected Hervey and other County employees in additional ways.  For example, late in 2003, Hervey was told that she must get Mastin's approval for all purchases for the jail exceeding $100.  Mastin Dep. 293; Hervey Dep. 55.[3]  At the time, Hervey saw this as another attempt to undermine her authority.  Now she sees it as also being motivated by the fact that she is a woman.  Hervey Dep. 53.  Mastin has a different explanation:  "The county board directed everything over $1,000 would go to the county board, and anything over a hundred had to be authorized by the agency head."  Mastin Dep. 293.  Mastin was to be the "agency head regarding jail administration," and thus Hervey would need to run purchases by him.  Mastin Dep. 293.

---

[3]Hervey claims that at "some point after that [she] was told that [she] needed to have permission for everything [she] order[ed] no matter what the cost was."  Hervey Dep. 55.

Another battleground between Mastin and Hervey — and this may be the biggest one, next to the question of the reporting lines — involved Mastin's request that Hervey check in with him each day after completing her two-hour shift as a corrections officer. Mastin Dep. 295. Nelson and Mastin managed to meet every day, and both thought it would be helpful for Mastin and Hervey to do likewise. Nelson Dep. 151; Mastin Dep. 294-95. Mastin asked Hervey to simply "find him" at some point every day. Hervey, though, insisted on making appointments. Mastin Dep. 295. Mastin did not want to make appointments; he just wanted Hervey to stick her head in his office, which was about ten feet away from Hervey's office.

Day after day, Mastin and Hervey battled over whether and how they would meet. A typical exchange would go something like this: Hervey would e-mail her daily schedule to Mastin and ask to schedule an appointment. Mastin would e-mail back and ask Hervey to just "stop by." Hervey would reply by e-mail and again insist on an appointment. Mastin would reply by e-mail and again insist that Hervey simply "find him" when she was free. And 'round and 'round they would go:   Two employees, sitting ten feet from each other, tapping away on their keyboards, arguing about how they might meet. Often the day would end without the two actually meeting.[4] *See, e.g*, Supp. Hervey Decl. Exs. Bates No. H 1262-63, 1368-69, 1382-83.

Yet another battleground between Mastin and Hervey involved the issue of employee evaluations. Mastin's predecessor had been so "hands off" as an administrator that he had never conducted formal evaluations of the employees whom he supervised. Mastin Dep. 51-52. Mastin decided to change this policy. Mastin Dep. 51-52. Performance evaluations were not

---

[4]Nelson summarized the absurdity of this conflict: "They're 10 feet apart . . . if they can't meet, [if] she can't meet with him, there's something wrong. She walks by his office, [if] he's in there, stop in. That's all I've asked of her." Nelson Dep. 160.

new to Hervey, as she routinely evaluated the staff that she supervised, but she balked at the notion of being evaluated by Mastin.  Hervey felt it was "meaningless for [Mastin] to evaluate [her] job because he does not even know what [her] job is."  Hervey Dep. 124.

Mastin nevertheless evaluated Hervey on February 6, 2004.  Culberth Decl. Ex. 89 at E. The evaluation indicated some of Hervey's strengths.  For example, Mastin gave her a top grade of "5" in the area of "position knowledge" (noting that she is "[g]reat in this area"), as well as a "4" in "initiative"(noting that she "is always willing to accept responsibility and eager to learn new methods for tasks").  *Id.*  The evaluation also discussed some of Hervey's perceived weaknesses.   For example, Mastin gave her a "1" in "teamwork" (noting that she needs to "[b]ecome a team player for the whole of the Sheriff's Office, not just corrections").  *Id.*

In claiming that Nelson and Mastin discriminated against her, Hervey cites all of these things — her being required to report to Mastin, her being asked to cut her budget, Nelson and Mastin being angry at her for going over their heads to the County Board, her being asked to work two hours each day as a corrections officer, her needing Mastin's approval for expenditures over $100, the constant fighting over the daily meetings, and the negative aspects of the evaluation that Mastin gave her.  She also points to many other slights, too numerous to recount here.

### B.  Hostile Environment

Hervey accuses Nelson and Mastin of creating a hostile work environment — and thereby sexually harassing her.  Hervey relies on the facts described above, as well as others. Mostly, Hervey focuses on the tone that Nelson and Mastin used when speaking to her.

Hervey alleges that Nelson and Mastin often spoke to her in an angry and demeaning way.  Hervey cites as an example the April 11, 2003 meeting, at which, she alleges, Nelson yelled that he was "so damn mad" about Hervey's refusal to report to Mastin.  Culberth Decl. Ex. 89 at J, K.  Hervey states she "sat there for an hour and listened to him yell."  Hervey Dep. 136.[5]

Hervey cites another example of Nelson and Mastin losing their tempers with her.  In September 2003, Hervey became concerned about shotguns being present in squad cars while prisoners were being transported.  Rather than discuss her concern with her supervisors — Nelson and Mastin — Hervey sent an e-mail directly to the County Attorney's Office, asking for a legal opinion about the practice.  Hervey Dep. 135.  Nelson and Mastin were furious that Hervey went over their heads to the County Attorney without simply asking them to take the shotguns out of the cars.  Mastin Dep. 118.  Mastin also viewed Hervey's contact with the County Attorney as breaching an unwritten rule not to take intra-departmental disagreements outside of the Department.  Mastin Dep. 54.  Hervey claims that, during the discussion of her e-mail to the County Attorney's Office, Nelson yelled at her, telling her over and over again that she did not respect anyone in the office.  Hervey Dep. 135.

Angry exchanges between Nelson and Hervey, or between Mastin and Hervey, became common.  The tension in the Sheriff's Department — especially in the ten feet of territory between Hervey's door and Mastin's door — was palpable.  Chris Raboin, the Chief of Police of

---

[5]For purposes of this summary judgment motion, the Court must assume that Hervey's version is true.  It should be noted, though, that the Court has reviewed much of the voluminous correspondence between Nelson and Hervey, and the Court has been struck by Nelson's patience and civility.  Nelson time and again refuses to take the bait; he instead responds calmly and politely to even the most pointed communications.

International Falls, "was sandwiched between the two" and had to leave his office on at least one occasion because a conversation between Mastin and Hervey escalated into a heated disagreement.  Raboin Dep. 26-27.  He does not recall, however, that the arguments ever crossed the line to harassment or abuse.  Raboin Dep. 27-28.  The conversations instead "sounded like some arguing back and forth," but there was "nothing that really would alarm [Raboin] other than [not] want[ing] to hear any of it."  Raboin Dep. 27-28.

Sergeant Brian Youso, who occupied the office on the other side of Mastin, was irritated with the volume in which Mastin conducted *all* of his conversations.  Youso Dep. 36-37 ("[M]orning speaker phone conversations, messages left. . . [Mastin]'s got everything full blast. I can't — it's irritating, and I shut my door at times; at times I leave.")  Youso did find some of Mastin's interactions with Hervey "demeaning," and felt that Mastin never understood how to communicate effectively with Hervey.  Youso Dep. 36-37.

Mastin clearly had a strong personality and an aggressive presence.  He seemed to put many in the Sheriff's Department — male and female — on their guard.  Raboin Dep. 33; Fults Decl. ¶ 6, 8.  Hervey claims that she was afraid to be alone in a room with Mastin because he was so aggressive and forceful.  Hervey Dep. 211-12.  Hervey alleges that the heated conversations and tension in the office created a hostile work environment.

Hervey also alleges that Nelson and Mastin contributed to this hostile work environment in other ways, such as by making requests or demands that eroded her authority as jail administrator and demeaned her as a human being.  Among the requests or demands cited by Hervey are her supervisors' requests that she get their permission before purchasing phone cards, receipt books, griddles for the jail kitchen, latex gloves, shampoo, toothpaste, deodorant, shaving

cream, and toilet paper.  Supp. Hervey Decl. Ex. B.  Hervey also complains of requests that she

get her supervisors' permission before changing employee meal policies, time sheet policies,

expense account policies, office key and access policies, vending machine policies, corrections

officer training procedures, corrections officer scheduling, fingerprinting policies, inmate

transport policies, and jail inspection policies.  *Id.*  She likewise complains of the requirement

that she meet every day with Mastin, with Mastin's evaluations of her, and of many, many other

indignities.  *Id.*

### C.  Retaliation

Hervey received her first formal performance evaluation from Mastin on Friday,

February 6, 2004.  Culberth Decl. Exs. 64-65.  That evaluation is described above.  Hervey

thought that the negative comments in the evaluation were unfair, and they upset her a great deal.

Hervey Dep. 108.

Hervey returned to work on Monday, February 9.  She had decided that she would file a

formal complaint against Nelson and Mastin, accusing them of sex discrimination.  Hervey Dep.

108-09.  She also decided that she would take the following day off so that she could work on

her complaint.  According to Hervey, she then left a voice mail message for Mastin, informing

him that she would not be in the office the following day.  Culberth Decl. Ex. 89 at 14-16.  She

gave no reason for her absence, did not personally speak with Mastin or Nelson, and did not

submit a written request for a vacation day.  Hervey Dep. 156.  Mastin claims that he never

received the voice mail message.  Mastin Dep. 171-72.

Hervey stayed home on Tuesday, February 10, to put together a lengthy written

complaint against Nelson and Mastin.  Culberth Decl. Ex. 89 at 15.  By the end of the day, she

realized she would need more time to complete work on her complaint, so she called two

dispatchers and asked them to inform Mastin that she would be out the next day.  Hervey Dep.

157-58.  It is not clear why she did not call Mastin or Nelson directly.  When Hervey did not

come to work on Wednesday, February 11, Mastin called her at home.  He asked why she was

absent and why she had not been at work on Tuesday.  Mastin Dep. 171-72.  Hervey told Mastin

that she had warned him about the Tuesday absence in a voice mail message, and that she had

asked the dispatchers to warn him about the Wednesday absence.  Culberth Decl. Ex. 89 at 16.

Mastin said that he did not receive the voice mail message, and he expressed disappointment that

Hervey had not directly informed him of her intent to miss work on Wednesday.  Mastin asked

Hervey to come to his office to "discuss the issue" when she returned on Thursday, February 12.

*Id.*  When Mastin hung up the phone, he had no idea that Hervey had skipped two days of work

to put together a complaint against him.  Indeed, Mastin had no idea that Hervey had concluded

that she had been the victim of sex discrimination.   Mastin Dep. 254-256.

On Thursday, Hervey reported to Mastin's office to discuss her absences of the previous

two days.  Mastin Dep. 155-57.  Nelson and Mastin suspected that Hervey had skipped two days

of work and lied about leaving a voice mail on Monday.  Mastin Dep. 209.  They were also

miffed that Hervey had used the dispatchers to inform Mastin that she would be gone on

Wednesday rather than calling Mastin directly.  In Nelson's and Mastin's views, these were just

the latest volleys fired by Hervey in her ongoing campaign to make their lives miserable in

retaliation for her "demotion."  Mastin Dep. 226-27; Culberth Decl. Ex. 72.

At this meeting — and without having any inkling that Hervey was about to accuse him

of discrimination — Mastin told Hervey that he would be recommending to Nelson that he

discipline Hervey for her conduct. Mastin Dep. 208-09.  Hervey responded by telling Mastin that she intended to file a discrimination complaint with the Minnesota Department of Human Rights. Mastin Dep. 209.  That same day, Hervey informed Koochiching County that she wished to make a "Respectful Workplace" complaint, Hervey Dep. 115, and the following day Hervey retained an attorney to represent her, Culberth Decl. Ex. 67.

At this point, the feud that was sparked when Hervey was asked to report to Mastin was almost a year old.  The tension in the office remained high.  On February 18, Mastin decided to take action against Hervey because of what he viewed as her unauthorized absences, her dishonest explanation, and her unapologetic behavior in their meeting.  Mastin took away Hervey's master key and distributed a memorandum informing the employees of the Sheriff's Department that Hervey would no longer be the final authority on jail issues.  Culberth Decl. Ex. 68; Mastin Dep. 257-58.  After several cancelled meetings, Nelson met with Mastin and Hervey on March 2 to discuss Hervey's unauthorized absences and her belief that she has been discriminated against.  Culberth Decl. Ex. 72.  Nelson decided to give Hervey a written reprimand and warning for her absences.  *Id.*

Koochiching County hired an attorney to investigate the Respectful Workplace complaint filed by Hervey.  The attorney determined that the allegations were unsubstantiated.  Culberth Decl. Ex. 47 (Memo dated May 21, 2004).  The County Board, in a closed-door session, came to the same conclusion.  Culberth Decl. Ex. 5 at 185-88.  On May 27, 2004, Hervey filed a claim with the Equal Employment Opportunity Commission.  She received a right to sue letter on August 2, 2004, and filed this lawsuit on October 19. 2004.  Culberth Decl. Exs. 8, 43, 45.

The commencement of this lawsuit did nothing to ease the tension in the Sheriff's Department. Nelson, Mastin, and Hervey continued to work side-by-side; Hervey continued to say and do things that Nelson and Mastin regarded as insubordinate; and Nelson and Mastin continued to take actions that Hervey regarded as discriminatory or as retaliation for her pursuit of legal remedies. For example, Hervey was suspended for five days in March 2005 for refusing to meet with Mastin on a daily basis. In July 2005, Hervey was suspended again — this time for 15 days — for continuing to refuse to meet with Mastin and for failing to comply with a number of other directives. Quiring Aff. Ex. H at 36-38.

## II.  ANALYSIS

### A.  *Standard of Review*

Defendants have moved for summary judgment. They make several arguments in support of their motion, but the crux of their position is that, whatever the actions that have been taken against Hervey, those actions were not motivated by the fact that she is a woman or by a desire to retaliate against her for complaining of discrimination.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could . . . return a verdict for [the non-movant]." *Baucom v. Holiday Cos.*, 428 F.3d 764, 766 (8th Cir. 2005).

Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).  Where the nonmovant provides evidence of such "specific facts," any dispute between that evidence and the evidence provided by the movant must be resolved in the nonmovant's favor.  *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).  But *facts* are required to defeat a motion for summary judgment — not "mere conjecture," *ACT, Inc. v. Sylvan Learning Sys. Inc.*, 296 F.3d 657, 666 (8th Cir. 2002), not "unreasonable inferences or sheer speculation," *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), and not "conclusory statements in [an] affidavit," *Jeseritz v. Potter*, 282 F.3d 542, 545 (8th Cir. 2002).

To defeat a motion for summary judgment, the nonmovant must present enough facts "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Evidence is not "sufficient" unless a reasonable jury could return a verdict for the nonmovant.  When a defendant has moved for summary judgment,

> the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment must be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

588 (1986).

## B. *Title VII Claims*

Hervey has sued Nelson, Mastin, and Koochiching County under Title VII for sex discrimination, hostile work environment, and retaliation. These claims are distinct. To prove sex discrimination, a female plaintiff must introduce evidence that her employer treated her differently — usually worse — than similarly situated male employees. *See LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 693 (8th Cir. 2001). To recover for a hostile work environment, a female plaintiff must introduce evidence that she suffered severe and pervasive harassment that she would not have experienced if she had been a man. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Finally, to prove retaliation, the plaintiff must introduce evidence that, after she filed a discrimination complaint, her employer took action against her to discourage her from, or to punish her for, pursuing that claim. *See Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 632 (8th Cir. 2005).

In this case, Hervey argues in connection with her sex discrimination and hostile work environment claims that Nelson and Mastin took various actions against her because she is a woman. She argues, for example, that, had she been a man, she would not have been required to report to Mastin, she would not have been asked to look for cuts in her budget, she would not have been asked to work two hours each day as a corrections officer, she would not have been asked to get Mastin's approval for expenditures over $100, and so on. With respect to the retaliation claim, Hervey argues that various other actions were taken against her to punish her for pursuing her claims of sex discrimination and hostile work environment.

-18-

There is no direct evidence that any of the dozens of actions cited by Hervey were motivated by the fact that Hervey is a woman or by the fact that Hervey was pursuing legal remedies.  Of course, it is often true in employment discrimination cases that there is no direct evidence that the employer acted on a prohibited basis.  But it nevertheless bears emphasizing in this case.  Hervey has spent 30 years as one of a small number of females working among male law enforcement officers in a small-town jail located in a remote county.  One would not be surprised to find in such a setting at least a little direct evidence of sex discrimination — a sexist remark, an off-color joke, a lewd e-mail message.  And yet the record in this case contains nothing of the sort, despite the fact that Hervey has spent much of the past three years recording everything that gave her offense.

Where, as here, the record is devoid of any direct evidence that the employer acted on a forbidden basis, the plaintiff's claims are analyzed under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff must first make a prima facie case of discriminatory conduct by the employer.  Then, to dispel the inference of discrimination created by plaintiff's prima facie case, the employer must articulate a legitimate, non-discriminatory reason for its conduct. *McDonnell Douglas*, 411 U.S. at 803; *Griffith v. City of Des Moines*, 387 F.3d 733, 735-36 (8th Cir. 2004).  Once the employer provides a legitimate reason for the allegedly discriminatory conduct, the plaintiff must show that "defendant's articulated reason was in fact 'not the true reason for the employment decision' and a 'pretext for discrimination.'" *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997) (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  "It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the

plaintiff's explanation of intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 519 (1993).  With this in mind, the Court now turns to each of Hervey's claims.

### 1. Sex Discrimination

Hervey first claims that she was discriminated against on account of her sex in violation

of Title VII.  To make out a prima facie case of sex discrimination, Hervey "must . . .

demonstrate that she (1) is a member of a protected class; (2) was qualified to perform her job;

(3) suffered an adverse employment action; and (4) was treated differently from similarly

situated males." *Hesse*, 394 F.3d at 631.  Hervey has clearly established the first two elements:

She is a woman and thus is a member of a protected class, and there is no doubt that she is

qualified to perform her job.

The defendants argue that the third element is missing because, they say, Hervey has not

suffered an adverse employment action.  They point out that Hervey continues to be employed as

jail administrator with essentially the same salary and benefits.  Hervey, in response, cites

dozens of alleged adverse actions, beginning with the "demotion" that she experienced in April

2003 when she was asked to report to Mastin rather than directly to Nelson.

Not everything that makes an employee unhappy is an "adverse employment action" for

purposes of Title VII.  Every employee has an occasional bad day.  Every employee is given an

unwelcome assignment or gets criticized by a boss or experiences rude behavior from a co-

worker.  To be actionable under the anti-discrimination provisions of Title VII, an "adverse

employment action" must materially alter or impact the terms of the plaintiff's employment.  *See*

*Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973 (8th Cir. 1998).  Put differently, the

action must be "'significant,'" it must have more than a "tangential effect on . . . employment,"

and it must be "'more disruptive than a mere inconvenience or an alteration of job
responsibilities.'" *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997) (citations
omitted). The Eighth Circuit has issued a number of opinions holding that an employee does not
experience an "adverse employment action" when, for example, she receives a negative
performance review or has some of her duties taken away. *See, e.g.*, *Zhuang v. Datacard Corp.*,
414 F.3d 849, 854 (8th Cir. 2005) (reassignment of duties); *Cossette v. Minn. Power & Light*,
188 F.3d 964, 972 (8th Cir. 1999) (negative performance reviews); *Harlston v. McDonnell
Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more stressful position with
more onerous duties).

      The Court agrees with the defendants that almost all of the actions cited by Hervey do not
rise to the level of an "adverse employment action" for purposes of the anti-discrimination
provisions of Title VII — including some of the actions about which she complains most
vehemently, such as being asked to report to Mastin or being asked to meet daily with Mastin.
But there are exceptions. Hervey has not merely had a duty or two reassigned; she has been
stripped of most of her major responsibilities. Moreover, Hervey has been suspended twice
without pay. There is no question that a suspension without pay is an "adverse employment
action" for purposes of Title VII. *See McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137
(8th Cir. 2006); *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 802 (6th Cir. 2004)
(the act of suspending an employee for 37 days without pay is "not the type of employment
action the court developed the adverse-employment-action element to filter"), *aff'd*, 126 S. Ct.
2405 (2006).

The weakness in Hervey's prima facie case is instead with the fourth and final element: Hervey has no evidence that she "was treated differently from similarly situated males." *Hesse*, 394 F.3d at 631.  This is obviously true with respect to many of the actions of which Hervey complains — actions that likely do not rise to the level of an "adverse employment action" anyway.  For example, the record is clear that Mastin wanted everyone (male and female) to report to him, Culberth Decl. Ex. 57 at 4; that everyone in Koochiching County (male and female) was asked to help find budget cuts, Mastin Dep. 293; that everyone in Koochiching County (male and female) was asked to take on additional duties or otherwise do more with less, Jaksa 172-73; and that Koochiching County imposed new budgetary procedures on everyone (male and female), *id.*  Hervey's argument that, for example, she was asked to find savings in her budget only because she is a woman is simply not credible.

As noted, though, Hervey did suffer adverse employment actions that were not widely inflicted on other employees — in particular, the loss of most of her major responsibilities and two suspensions without pay.  In order to show that she suffered these adverse actions because she is a woman — and not, for example, because of a personality conflict or because of her own behavior — Hervey must offer evidence of (1) a similarly situated male (2) who was involved in behavior that was of "comparable seriousness" and (3) who was given more lenient treatment. *Russell v. TG Mo. Corp.*, 340 F.3d 735, 745 (8th Cir. 2003).  The "individual[] used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

Hervey cites two such "similarly situated males":  Mastin and Mastin's son, Rich.  Rich

works as a police officer for the City of International Falls, but he sometimes fills in for the

Koochiching County Sheriff's Department as a backup deputy.  As to Mastin, Hervey complains

that he has never had his duties reassigned or been suspended without pay, even though he has

engaged in various misbehavior over the past 30 years, including serving time for robbery,

serving time for assaulting a police officer, lying on his application to the P.O.S.T. board, falsely

arresting a citizen, and twice being involved in serious domestic disputes with his wife.  Pl.'s

Resp. Mem. 46.  As to Rich, Hervey complains that the Sheriff's Department failed to act against

him even though he "violated the code of conduct by driving intoxicated over the legal limit."

*Id.* at 47.

There are two problems with the comparison that Hervey is trying to make.  First, Mastin

and Rich are not "similarly situated" to Hervey.  Mastin is Hervey's boss.  He is the undersheriff

of Koochiching County, second in line to the sheriff, with responsibilities that differ markedly

from Hervey's.  Rich is not even a full-time employee of the Sheriff's Department.  He is instead

employed full-time by the City of International Falls and fills in only occasionally as a deputy

sheriff for Koochiching County.  His responsibilities are also very different from Hervey's.

Second, the conduct of Mastin and Rich is not "similar" to Hervey's.  Hervey's reduction

in duties and suspensions came in response to persistent — even daily — conduct that her

supervisors viewed as insubordinate and disruptive, such as refusing to accept Nelson's decision

about reporting lines, refusing to help find savings in her budget, going over her superiors' heads

to the County Board to ask for more money, complaining about being asked to assume additional

duties, complaining about having to follow new budget procedures, taking unauthorized

absences, and going over her superiors' heads to the County Attorney.  Typical of Hervey's behavior has been her stubborn refusal to simply stick her head in Mastin's office each day and check in with him.  She has persistently dragged her feet about meeting with him — and, even when she has met with him, she has insisted on recapping the meetings in sometimes obsessively detailed e-mail messages.  *See, e.g.*, Supp. Hervey Decl. Ex. B.  In suspending Hervey, the Sheriff's Department cited this persistent insubordinate behavior, as well as other grounds such as failing to conduct fire drills, return time cards, fulfill canteen duties, and keep the jail stocked.  Quiring Aff. Ex. H at 36-38.

Hervey has not pointed to one male employee who has engaged in anything remotely like this type of behavior.  Mastin's conduct involved a few unrelated, isolated incidents, almost all of which occurred years or even decades before he was appointed undersheriff.  Rich's conduct involved a single incident that was unconnected to his fill-in work for Koochiching County.  It is impossible to compare, say, Hervey's refusal to meet with her supervisor on a daily basis with, say, Mastin's lying on an application over two decades ago.

Hervey has failed to submit any other evidence that Nelson or Mastin acted against her because of her sex.  Instead, she time and again substitutes speculation for evidence.  She is particularly fond of the following form of argument:  Sexist people believe that women should be compliant, defendants wanted Hervey to comply with their directives, and therefore defendants are sexist.  Or sexist people believe that women are incompetent, defendants accused Hervey of making mistakes, and therefore defendants are sexist.  The fallacies in Hervey's logic are obvious, and accepting such "logic" in place of evidence would mean that no employer could ever be granted summary judgment in a Title VII case.

Hervey has the burden of proof.  She must provide evidence (not speculation) that Nelson and Mastin acted against her because she is a woman (not because of her behavior, or because of a personality conflict, or because of any other reason).  Hervey has provided no such evidence. For that reason, Hervey has failed to establish a prima facie case of discrimination under *McDonnell Douglas*, and defendants are entitled to summary judgment on Hervey's discrimination claim.

### 2.  *Sexual Harassment*

Hervey also claims that Mastin and Nelson subjected her to a hostile work environment in violation of Title VII.  To support her claim, Hervey must make a prima facie showing that: "(1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus existed between the harassment and her protected group status; and (4) the harassment affected a term, condition, or privilege of employment."  *Hesse*, 394 F.3d at 629.  The harassment must be objectively severe and pervasive, and "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

Hervey alleges that, immediately after she objected to having to report to Mastin, "Sheriff [Nelson] and UnderSheriff Mastin began a concerted campaign to create an intolerably hostile environment."  Pl.'s Resp. Mem. 16.  Hervey focuses her hostile work environment claim largely — although not exclusively — on the fact that Nelson and Mastin often became angry with her and shouted at her.

Even assuming that Hervey has met the other elements of a prima facie case, Hervey has failed to point to any evidence that this harassment was based on sex. In other words, Hervey has failed to present evidence that Nelson and Mastin would not have lost their tempers with a male employee who, for example, challenged Nelson's authority to reorganize his staff or refused to help reduce the budget or went over Mastin's head to the County Board or persistently resisted a directive to meet with Mastin. To the contrary, Hervey has supplied evidence that Mastin's management style caused as much conflict with male employees as with female employees. Raboin Aff. 33. Gary Loop, one of the E/911 corrections officers, spoke to the County Coordinator about the dynamics in the Sheriff's Department, as "the low morale and lack of teamwork that John Mastin and Nelson [] fostered had become nearly intolerable." Loop Decl. ¶ 12. Another corrections officer, Joe Fults, felt forced to resign because he "finally had enough of John Mastin." Fults Decl. ¶ 5. In Fults's view, Mastin "created an atmosphere of discontent amongst employees." Fults Decl. ¶ 6.

Title VII is not a "general civility code," *Oncale v. Dundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1980), and "generalized harassment in the workplace is not illegal under Title VII," *Hesse*, 394 F.3d at 630. Nelson and Mastin might have been the world's worst supervisors, and they might have run the world's most hostile workplace, but, as long as they did not act against Hervey because she is a woman, they cannot be held liable under Title VII. *See id.*

*Joens v. John Morrell & Co.*, 354 F.3d 938 (8th Cir. 2004), is instructive. In *Joens*, the plaintiff, LaDonna Joens, alleged that her shift supervisor, Herman Johnson, "constantly swore, yelled at her, and accused her of not doing anything," and singled her out for criticism. *Id.* at 939. The Eighth Circuit, however, affirmed summary judgment in favor of the employer,

finding, first, that Joens did not prove that the conduct was sufficiently severe or pervasive, and

second, that the claim lacked any causal link to sex-based animus:

> Johnson never physically threatened Jones.  He made no sexual advances or
> comments to Joens, and they had no contact other than Johnson's allegedly
> abusive complaints that Joens was not making enough boxes for the cut floor. . . .
> Particularly given the gender-neutral nature of Johnson's complaints, this
> constitutes nothing more than unsubstantiated suspicion that Johnson's allegedly
> abusive treatment was based on sex.

*Id.* at 941-42.

Like the plaintiff in *Joens*, Hervey claims that she was not "allowed to do the job she was

hired to do because of her gender."  Pl.'s Resp. Mem. 25.  But, like the plaintiff in *Joens*, Hervey

has provided nothing more than "unsubstantiated suspicion" that Nelson and Mastin acted

against her because of her sex.  That speculation is not merely "unsubstantiated"; it conflicts

with evidence in the record, such as the fact that Nelson appointed Hervey to her position, gave

Hervey almost complete autonomy for two years, and fought to save Hervey's job even while

Hervey was criticizing him for making her report to Mastin.

Because Hervey has no evidence of a connection between whatever harassment she

suffered and the fact that she is a woman, she has failed to make out a prima facie case of a

hostile work environment, and defendants are entitled to summary judgment.

### 3.  Retaliation

Even if Hervey has not been the victim of sex discrimination or of a hostile work

environment, Hervey is nevertheless entitled to recover against defendants if they retaliated

against her for pursuing her rights under Title VII.  To establish a prima facie case of retaliation,

Hervey must show "(1) that she engaged in activity protected under Title VII; (2) that an adverse

employment action was taken against her; and (3) that there was a causal connection between the two." *Hesse*, 394 F.3d at 632.  The first two elements are clearly present:  Hervey has engaged in activity protected by Title VII, and, as this Court has already held, Hervey suffered adverse employment action when she was stripped of most of her responsibilities and suspended twice without pay.[6]  The question is whether Hervey has presented evidence of a "causal connection" between her protected activity and the adverse actions.

Hervey's feud with Nelson and Mastin began in April 2003.  Hervey makes this point clearly in her brief.  For example, Hervey writes at one point:

> When [Hervey] objected to being "put in her place," with objective evidence that her job description and County organizational charts showed she was a peer to the Undersheriff and reported directly to the Sheriff, Mastin and Nelson erupted with anger and *started on a course of discrimination and retaliation that continues to this day*.

Pl.'s Resp. Mem. 2-3 (emphasis added).  Later in her brief, Hervey similarly asserts that

> *[b]eginning immediately following this meeting*, the Sheriff and UnderSheriff Mastin began a concerted campaign to create an intolerably hostile environment for . . . Hervey.

*Id.* at 16 (emphasis added).  In other words, Hervey clearly alleges that defendants began to discriminate against her, create a hostile work environment, and retaliate against her in *April*

---

[6]In *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court held that an action may be an "adverse employment action" for purposes of a retaliation claim, even if the same action is not an "adverse employment action" for purposes of a discrimination claim, *id.* at 2415.  An employment action can be  "adverse" for purposes of a discrimination claim only if it has a material impact on employment.  But an action can be "adverse" for purposes of a retaliation claim even if it does not have a material impact on employment, as long as it might discourage unfettered access to the statutory protections of Title VII.  *See id.* at 2412.  Given that Hervey's loss of major responsibilities and suspensions without pay have already been held to be "adverse" for purposes of her discrimination claim, those actions are obviously "adverse" for purposes of her retaliation claim.

*2003.*  And, in support of her allegations, Hervey has cited many of the adverse actions recounted above, such as being required to report to Mastin, being asked to cut her budget, being assigned additional duties, and being yelled at.  All of this happened before February 2004.

The problem is that Hervey gave defendants no reason to believe that she regarded herself as a victim of sex discrimination — and thus gave defendants no reason to believe that she had engaged in activity protected by Title VII — until *February 12, 2004*.  This was almost a year *after* she started feuding with Nelson and Mastin.  Bad things happened to Hervey before February 12, 2004, and bad things happened to Hervey after February 12, 2004.  The former obviously could not have been in retaliation for Hervey's pursuit of her legal rights.  The latter could have been — but they could just as easily have been a continuation of the feud.  What Hervey must provide is evidence that, when something bad happened to her after February 12, 2004, it happened because she was exercising her rights under Title VII, and not for some other reason (such as insubordinate conduct on her part).

Hervey relies almost entirely on the temporal proximity between her engaging in protected activity and the defendants taking adverse action.  For example, Hervey points out that within a week after she informed Mastin that she would be pursuing legal remedies, Mastin took away her master key and posted a memo informing employees that she was no longer the final authority on issues related to the jail.  Hervey Decl. Ex. 1 at 40-41.  This was an important step in eliminating most of Hervey's authority, and its close proximity to the February 12, 2004 meeting between Mastin and Hervey gives rise to an inference that it was retaliatory.

Similarly, Hervey points out that her second suspension — in July 2005 — occurred about two weeks after she asked to take vacation time to attend depositions that her attorney had

-29-

recently scheduled in this action.  Again, Hervey argues that the close proximity of her request and the suspension gives rise to an inference that defendants were retaliating against her.

Although the question is close, the evidence cited by Hervey is not sufficient to make a prima facie case of a connection between protected activities an adverse actions.  The Eighth Circuit has held that "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  This case illustrates the wisdom of that holding.  Beginning in February 2004 and continuing to this day, Hervey has been engaged in pursuing her legal rights while she has simultaneously been engaged in a feud with her supervisors.  Because of the former, she has often engaged in protected activity.  Because of the latter, her supervisors have often taken action against her.  Every one of those actions was necessarily in at least somewhat close proximity to a protected activity, because both the actions and the protected activity have been ongoing.

Thus, as the Eighth Circuit has held, Hervey cannot rely solely on the "temporal connection" between her informing Mastin of her complaint on February 12, 2004 and Mastin disciplining her a few days later — especially when Mastin informed Hervey of his intention to discipline her *before* Hervey informed Mastin of her intention to file a complaint.  Culberth Decl. Ex. 89 at 16.  Likewise, Hervey cannot rely solely on the temporal connection between her asking for time off from work to attend depositions in early July 2005 and her suspension in late July 2005 — especially since the suspension was Hervey's second and it was for a long list of problems that arose before the depositions were even noticed.  Quiring Aff. Ex. H at 36.  Hervey needs at least some evidence — in addition to temporal proximity — that an adverse action was

retaliatory, and she appears to have no such evidence.  (Hervey has not been able to cite even a temporal connection between the March 2005 suspension (her first) and a significant event in the litigation.)

Even if this Court were to find that Hervey had made out of prima facie case of retaliation, Hervey's retaliation claim would be dismissed.  The defendants have provided legitimate, non-discriminatory reasons for the suspensions and other actions taken against Hervey.  Specifically, they have cited a continuing course of insubordinate conduct by Hervey — such as the daily dramas over the request that she meet with Mastin — as well as deficiencies in her performance of her remaining duties as jail administrator.  Title VII's anti-retaliation provisions cannot be used to "insulate an employee from discipline for violating the employer's rules or disrupting the workplace."  *Griffith*, 387 F.3d at 738 (quoting *Kiel*, 169 F.3d at 1136).

In response, Hervey disagrees with many of the reasons that defendants gave for their actions, but she has provided no evidence on which a reasonable jury could rely to find that the defendants' explanations are pretextual.  Hervey has pointed to temporal connections between protected activities and adverse actions, but, as noted above, that evidence is insufficient even to make out a prima facie case of retaliation.  Hervey also offers the affidavit of a female corrections officer, Jan McClanahan, who states that she is afraid that she might suffer retaliation for assisting Hervey in this lawsuit.  McClanahan Decl. ¶ 2.  McClanahan cites no evidence that her fear is well-grounded; in fact, McClanahan admits that she is "on very good terms with John Mastin . . . [and has] not received criticisms of [her] job performance from him or anyone else."  McClanahan Decl. ¶ 7.

For the reasons described, Hervey has not made a prima facie claim of retaliation, and defendants are entitled to summary judgment.

### C. MGDPA Claim

Hervey's final claim is asserted against Koochiching County under the MGDPA.  Here are the relevant facts:

On July 1, 2004, Mastin tape recorded a meeting with Hervey and had a transcript of the meeting prepared.  Mastin Dep. 291-92.  Mastin brought the transcript home and left it on his kitchen table.  R. Mastin Dep. 10.  Later, Mastin and his son Rich discussed Mastin's conflict with Hervey, and Mastin gave Rich a copy of the transcript.  R. Mastin Dep. 10.  Rich took the transcript from his father, put it above the visor in his truck, and did nothing more with it. R. Mastin Dep. 10.

A few weeks later, Rich got into an accident while driving drunk, and the transcript ended up in a ditch, where it was found by investigating officers.  R. Mastin Dep. 9-10.  The local newspaper reported that a transcript of a meeting between Mastin and Hervey was found at the scene of Rich's accident.  The newspaper did not reveal the contents of the transcript. Hervey Dep. 215.  Hervey nevertheless felt "humiliated" by the newspaper account.  Hervey Dep. 215.

Under the MGDPA, "[p]rivate or confidential data on an individual shall not be . . . disseminated by government entities for any purposes other than those stated to the individual at the time of collection."  Minn. Stat. § 13.05 subd. 4 (2001).  Only a government entity — and not an individual public employee — can be held liable for disseminating private or confidential data in violation of MGDPA.  Minn. Stat. § 13.08 subd. 1.  Moreover, a government entity cannot be

held liable for the unlawful dissemination of private or confidential data by an individual employee unless that employee was acting within the scope of his employment. *Walker v. Scott County*, 518 N.W.2d 76, 78 (Minn. Ct. App. 1994).

Even assuming that all other requirements of the statute are met, Hervey cannot recover against Koochiching County because she has no evidence that Mastin was acting within the scope of his employment when he gave the transcript to Rich. *Walker v. Scott County* presented similar facts. In *Walker*, a deputy sheriff obtained Bernard Walker's criminal record from a county computer in his office and gave the information to his father. *Id.* The Minnesota Court of Appeals held that Scott County could not be liable for the deputy sheriff's actions because (1) his conduct did not benefit the County and (2) his purpose in obtaining the information was entirely personal and therefore not within the scope of his employment. *Id.* at 78-79.

Similarly, Mastin obtained a transcript of a meeting with Hervey and gave a copy of the transcript to Rich. Mastin and Rich are father and son. Mastin gave Rich the transcript in the family kitchen. Neither Mastin nor Rich was "on duty" while talking in the kitchen. There is no evidence that Mastin's giving the transcript to Rich benefitted Koochiching County. And there is no evidence that, in giving the transcript to Rich, Mastin was performing or intending to perform any professional duty. Mastin acted wrongly, and Koochiching County had ample justification to discipline him. But Koochiching County is not liable for Mastin's action under the MGDPA.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1.  Defendants' Motion for Summary Judgment [Docket No. 108] is GRANTED, and

2.  Plaintiff's claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  October  20,  2006                    s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge